And we'll move on to our final case of McLeod v. Zero Gravity Management. And counsel, when you're ready to proceed. Devin McRae, I represent plaintiff and appellant Kirk McLeod. I'd like to reserve three minutes. Sure. So I really think there's only four documents or items for the court to focus on in reviewing this case. Counsel, could you try to speak up a little more, move the mic closer? Thank you very much. Sure, I'm sorry about that. No, no problem. Thank you. The first thing is the hearing transcript for the summary judgment motion. There's been argument about waiver, what was argued. It's always been our primary theory of the case. It's the first claim for relief, breach of contract. And it's always been that there was a subsequent oral agreement between the three parties and that there are implied terms by custom and usage. And that is not a new argument and it was flushed out at the summary judgment hearing. And not only that, the defense counsel at the hearing acknowledged the argument. They had a different theory, but it's not supported by the law. So if the court, and I'd like to go over some of these provisions if I may.  First at 3 ER 535. This is defense counsel speaking to the court at lines 16 through 22. The last kind of agreement is the oral agreement. When the written representation agreement expired in 2013, both parties agreed that the representation continued pursuant to an oral agreement. What's missing are the terms. According to plaintiff, he did not view himself for zero gravity as bound by the terms of the written agreement after it expired. So ultimately, there is no breach. That was the defense's theory, that they hadn't expressed the terms of the oral agreement with respect to the managerial relationship. And what we responded with was said, look at our expert report. There are implied terms pursuant to custom and usage. And on the very next page, well, it's not the very next page. At 3 ER 538, plaintiff's counsel, my colleague here, Mr. Gray, argued, and the point of our expert report, Your Honor, is that there has very specific obligations when you take on to become someone's manager. And those include, according to our expert who describes them, is accurate and timely communication, zealous representation of your client's interests, and giving advice regarding the various choices to your client's benefit and to avoid conflicts of interest. Those are the custom and practices in the entertainment industry. So it gets better. Mr. Goldberg later then says, 3 ER 543, again, this is defense counsel. This is their motion, so I think they're stuck with these comments. And he says, inasmuch as the evidence is going to be construed in plaintiff's favor on this motion, plaintiff testified, Kurt McCloud testified that he did not view himself or Zero Gravity as bound by the terms of the written representation agreement after it lapsed in 2013. What he said was the terms of the subsequent oral agreement were that Zero Gravity would remain his manager and he would remain Zero Gravity's client. So we defer, so we defer to the plaintiff's understanding of the agreement that succeeded or survived beyond the written representation agreement. Well, the plaintiff, Kurt McCloud, gave a lot of testimony about what his understanding of the agreement was. And he testified very clearly that he believed that his managers, both of them, Eric Williams and Mark Williams, were bound by the custom and usage that he had learned. So let me jump in here for a second just so I understand your argument, because your argument is that there is his testimony, your client's testimony, established, at least for summary judgment purposes, that a contract, an oral contract, existed post-termination of the written contract, correct? Yes, and in fact defense counsel agreed at the hearing. All right, so is there any other evidence? In reading the district court's order, the district court seemed to think there was really no evidence. And so I want to make sure that I understand your arguments as to what evidence exists. We have the testimony of your client, but I did not see in the record any contemporaneous written, like text messages or e-mails or anything like that. So is this a he said, he said case, or is it a he said plus some, you know, there's a text message saying, yo, manager, I'm ready to write another movie or anything like that? The documents that exist, you know, that are out there, there's not a document that says I'm your manager, we're confirming, that's why it's an oral agreement. But there are communications that would reflect Mark Williams acting as a manager. And I can point one to you in the record. Sure. Sorry. Thank you. Thank you. Thank you. There is an e-mail, and I will cite for the court. Rebuttally, you can get it to us. Yeah. But the nature of the e-mail is Mark Williams getting involved in the negotiation. When Sculptor, the new financer, came in, Eric said, Mark's going to get involved, too. And so that was outside Mark Williams' capacity as a producer. He was getting involved to advance McLeod's interests. And I will give you that set of how-to here with me. Are you in any way relying, I find this page, or at least what I printed out, hard to read, but this ERA 24, the WGA directory listing Mark Williams as manager, is that part of your evidence, or am I misviewing this? Well, yes, I think it's evidence, and we're not relying solely on that, but it's outward facing, as our expert talked about during his debate. I mean, this is something people in the industry would be looking at. Yes, and particularly those who are looking for managerial representation. All right. So we have the document that Judge Bennett just referenced. You have an e-mail that you'll get us during your rebuttal. The reason I'm asking this question is because I read the district court's order to say, look, there was just nothing to support that no jury could possibly find that Mr. Williams was a manager. So I'm just trying to get your best case while we've got you here is why that was wrong. So we have the testimony, and a few other things. I think that certain testimony was overlooked, and I think the best testimony, and I would like to read it to you. It's a page answer, but the question is directly put to the plaintiff. Okay. What page? ER 1439. That's 7, Volume 7, 1439. He said, okay, did Mark Williams ever refer to himself as your manager? Answer, yes, he did explicitly. Question, over what time period? Here's the long answer. Okay, so I mean in addition to him being a signatory on my management representation agreement, I remember the conversation. It was just after we discussed that there had been a bunch of revisions that I was making for a director named, I'm going to leave the director's name out just for his privacy.  And there had been some conflict between me and Mark because I was getting confused. The way he was acting, he was making these unilateral decisions without me, like without checking with me. I believe he had me do all those revisions and really urged me to do all those revisions all summer to get the script to a place the director had wanted. And then he fired or released the director without talking to me, and I was getting stressed. So the reason I remember this is I, we had a call, and I was, and I made clear. I said, Mark, you're acting as though you own this screenplay, and you don't. This is my screenplay. I control what happens. And something to the effect of, you need to tell me if you're going to do something like that. And I remember him, I remember him asking, I remember, sorry. And I remember asking him, how does this work? Like if you're taking the role of producing the movie, and Eric's my manager, and you guys talk to each other and are obviously brothers, like isn't there like too much overlap here? And how do I decide, for instance, if I wasn't happy with the job you were doing as a producer, how do I decide, okay, Eric's going to manage me, and I won't do it with you? And that's when he explicitly stated to me, and I won't ever forget it, I am your manager. And the comments stuck with me because it sort of cued into me like, oh, there's management teams, and Mark may be taking this producer role, but he's still my manager. Is this happening before or after the written representation agreement expired? Sort of where in the course of the relationship is this?  This is after. And he said that in his deck, right? Yes. I mean in his deck he said after the written agreement expired, Mark expressly said, I am your manager. And this is the testimonial expansion of his declaration, and it's under cross-examination, and he continues, and he told me that, you know, I'm your manager. I'm doing this. The reason why I'm firing the director or going a different route is in your best interest. So he's telling him he's acting as a manager in his best interest by making the decision to terminate the director. Okay. So on this point, though, at page 1129, when he's asked to sort of place at least one of these conversations where Mark says, I am your manager, he says it could have been within the two-year term or it could have been after. So how do we deal with that? Well, the point is he said throughout his testimony, and I'll give additional sites to that, Mark was saying that all the time. They were saying it to each other, and that was the oral agreement, like, yeah, I'll be your talent. You will be the managers, and they would hold themselves out to third parties and such. So he said it a lot. So in that answer, he's talking about one occasion. This one was after, and there were multiple expressions by Mark Williams. The portion that you just read, that was after? Yes. Okay. And so there's only really one case that the court needs to look at, and that's Howard Entertainment v. Kudrow, because the defense in that case, it was the talent that was making the argument, well, yeah, we have an oral agreement, but we didn't discuss the terms, and therefore there's no breach of terms not discussed. And in that case, the manager had been terminated. They had an oral agreement for 10% of the talent's income, but the talent, Lisa Kudrow, terminated the manager. They didn't discuss whether there would be any post-termination commissions. She didn't pay him. He sued, and he says, hey, I get post-termination commissions pursuant to custom and usage in the industry. And the trial court granted summary judgment for the manager saying no discussion, no contract, no breach. Court of Appeals said no. Custom and usage can supply evidence of implied terms pursuant to an oral agreement. And that's always been our primary theory here. It's our first claim for relief. It's a breach of contract. And we talked about the various breaches in connection with the fiduciary duty claim because the custom and usage of the managerial capacity is that of a fiduciary because you're taking responsibility for the talent's career. And the managers have more power over talent than just about anybody else. And they're interfacing with all of the other representatives on top of it. And routinely, they're the ones that are directing counsel for the talent with respect to any engagement by the talent. And it's usually done through the manager. And all of that stuff is outlined in the expert report of Mr. Ginsburg. And he goes through it quite well. There are no pending evidentiary objections to Ginsburg's report. There are no objections to that. And he goes through each of the facts that occurred, and these facts, these things that occurred, they're not disputed, and says how they depart from custom and usage in the motion picture industry. We go to the question of damages for a moment. And could you tell me what evidence there is that Sculptor Media would have been willing to increase McLeod's compensation? I mean, because I saw that at one point they attempted to reduce his compensation. The record shows, and this is in McLeod's testimony. This is in Ginsburg's report that this type of conflict of interest is not by itself the problem. The problem was the managers acting against the best interests of their client and acting solely for themselves. These types of things come up, and Mr. Ginsburg mentions in his report that it's not uncommon for the manager, if you're taking money as a producer, to shift a little bit of that money back to your client because that's the fair and the right thing to do. Here, the producing line in the budget was $8 million, and Mark Williams got over a million. So you have Ginsburg saying, hey, look, a fair price on this would have been $500K to $750K. What should have happened is Mark Williams should have took his million and given a couple hundred thousand to McLeod. To follow up, though, on Judge Thomas' question, let's assume hypothetically we were to find that there was an oral agreement and hypothetically that your client was never informed of the increased budget and should have been. The description you just gave as to how that translates into a damage number that a court could award, that sounds pretty speculative to me. I mean, what is your best evidence that a number, a particular number, whatever it would be, isn't speculative? Because it sounds like you're saying, well, you know, we could have asked for more. Well, I'll tell you the best evidence is Ginsburg's expert opinion that that would have been a fair price. And I'll add that Gasmer, the defense expert, agreed. Ultimately, he came to the point like this deal was not equitable and he should have got more money. But why is should have equal to had to? So it doesn't have to come from Sculptor. The money didn't have to come from the financer. Mark Williams should have paid the money to McLeod or they should have had that discussion. So it's not speculative because he could have. He got a million dollars. There's an $8 million line in the budget. So it's easy for the producer to kick in a little bit of their own money to the talent, and he didn't. And this raises something I wanted to. Let's say, again, we have these hypothetical. We hypothetically are agreeing with you up to a certain point. And we hypothetically agree that your client should have been informed that the budget was now in the 40s. And hypothetically, he would have said, I want more money. What legal obligation would the defendants have had at that point to say, okay, we're going to give you more money? Well, they needed a document in order to commence principal photography that would have cleared the chain of title, which was a whole facade anyway. But they weren't going to be able to go over. So everybody agrees there was an extreme amount of leverage that McLeod had at that moment. So he could have said, I'm not going to sign unless you give me more money. Go away. Yes. Exactly. And I would, again, say so much of this case is about what the record says or what it doesn't. And if the court were to just carefully review the transcript of the plaintiff, all of these things are answered. At the end of his deposition, the defense counsel took him through each claim. Well, what do you claim the implied oral terms were? What were the breaches of fiduciary duty? What was the fraud? He walked it through and hit it out of the park. And he even discussed his damages. And I'll point, you know, Ginsburg reported the one I was referring to. I should note that in the context where a commissioning representative is receiving his or her own pool of compensation, as here regarding defendant's producing fee, a portion of that pool is a potential source to go toward closing the gap in renegotiation. And the plaintiff testified that if my managers had been acting in my best interest, that's what they would have done. And they didn't. Instead, Mark Williams decided he wanted to take story by credit at the last minute after signing five or six successive contracts indicating on its face that it was an original screenplay by Kurt McCloud. You're getting close to the end of your time. Do you want to reserve the remaining time you have? I do. All right. And because we did ask him a few number of questions, we'll give him the three minutes he requested. Good morning, Your Honors. It may please the court. Jocelyn Sperling for Defendants and Appellees, Euro Gravity Management, and Mark and Eric Williams. I'd like to focus on damages because it's dispositive of all of the claims. So there's no triable issue of fact on the two categories of damages at issue, and the court's already asked some questions about the first. The first relates to the theory that McCloud could have obtained a higher price for the film had he known about the increased budget, and the second relates to the contingent compensation fraud theory. So starting with the first one, it is speculative to assume that Mr. McCloud would have tried to renegotiate a higher price had he known about the increased film budget, and there's no evidence that Sculptor Media would have paid more had he tried. So the price cap in all of the option agreements was tied to a budget of $5 million, and Mr. McCloud had known that the budget could be up to $10 million, and yet he didn't ask his attorney to negotiate a higher cap in any of the option agreements. His attorney also did not try to negotiate a higher price, even though he knew that there was financing up to $20 million, so four times the $5 million cap. Is there any evidence in the record that your clients informed Mr. McCloud that the budget had gone up to 30? I may have the number slightly wrong, had gone up to 32 and then 43? There is conflicting evidence. All right, so there's a disputed issue of fact at least. Exactly, on the 42 and whether Mr. McCloud was informed about that. So if we were to find that there were an oral agreement and a jury or trier of fact were to find that this wasn't disclosed and should have been, isn't the fact that there was significant leverage there, that that was a breach, that that provided leverage, isn't that enough to allow a jury or other trier of fact to conclude that some amount of money could have come to him from this because he would have been able to do this, he would have been able to do this, and he would have been able to say to his managers, you breached, I found this out, and I'm entitled to more. And that's the industry practice. Isn't that enough to get to a trier of fact? There isn't evidence that there was significant leverage. So his attorney testified that for the 2020 option agreement, getting Sculptor Media to agree to the amount in the 2018 option agreement was the best he could do. And his attorney didn't try to renegotiate the price, even though he said there were lots of things in this deal that were below market. And the opening brief says that his attorney was not involved in negotiating the price, but the evidence is to the contrary. Sugarman, exactly. So in 2019, in November, before the 2020 option agreement, McLeod asked for Sculptor Media to send the offer, quote, directly to Matt Sugarman, and I will take direction from him. So it's important to note that he made it clear he wanted his attorney to be involved in the negotiations, and his attorney did handle it. So his attorney never advised him that the purchase price was unfair, even though he knew about financing up to $20 million. Again, he said there are lots of things in this deal that are below market for my client. He still didn't try to renegotiate. So it's speculative that his attorney, knowing that the budget increased more, would have tried to renegotiate because, again, $20 million in financing is four times the $5 million cap that the $125,000 was tied to. So there's the speculation about whether his attorney would have even tried to renegotiate. It's also speculative to assume that Sculptor Media would have paid him more. So, you know, he had agreed to the same cap in four option agreements, including the 2020 option agreement, that was still in effect when the purchase agreement was signed at the end of that year. A different term, you know, they re-signed a new agreement to deal with a different term, the story by issue. So, you know, the cap was already in effect, and Sculptor Media had tried, I think as Judge Thomas mentioned, had tried to reduce the purchase price in the option agreement. And, you know, as the district court explained, there was no evidence in the record that an increased budget meant that there were more funds to go to Mr. McLeod. Mr. McLeod could have asked in deposition to Sculptor Media, when the budget increased, where did those funds go to? Were there extra funds that could be distributed to Mr. McLeod? Has Sculptor Media ever renegotiated the price when a budget has increased? There's no testimony to that effect. And again, another point is that a partner at Sculptor Media testified that the producer fee paid to Zero Gravity didn't affect the amount paid to Mr. McLeod, and it would not have paid Mr. McLeod more had the producer fee been lower. So that is the testimony about the fact that the producer fee and the payment to McLeod weren't related, and it's just speculation to assume that, you know, Sculptor Media would have paid more had the producer fee been lower. And in fact, like I just said, it's contrary to the evidence in the record. And the backdrop is that there was no other interested buyer over the course of a decade. And this is the first screenplay that Mr. McLeod had ever sold, and he wasn't in the Writer's Guild. So with all that evidence, we have Mr. McLeod's report, expert report, stating that he could have renegotiated a higher price had he known about the increased budget. But the report really speaks in generalities, and it relies on unsupported assumptions, for example, that there were available funds to pay more. But again, there's no evidence in the record that there were any available funds when the budget increased. It could have gone to actors, or we don't know, because there's no evidence in the record. And it's Mr. McLeod's burden on summary judgment to raise, you know, specific facts showing a tribal issue on damages. And, you know, again, we point to cases under California law that reversed damages award that were speculative, even though there was expert testimony. So some of the cases talk about the effect of damages or the right to damages or even causation. But the point is that it has to be shown with reasonable certainty. And the reply brief really doesn't address the heart of those cases, which is we're not talking about the amount of damages. We're talking about the fact of damages. And I've kind of walked through all of the evidence that shows that damages were speculative. So in terms of the leverage question, that's just very speculative that he could have, you know, obtained more had he asked. And again, we don't even know if his attorney would have asked, because when the financing went up to $20 million, he did not say the purchase price was unfair, the purchase price of $120,000. And so, again, it's speculative. So I wanted to just quickly mention the other damages theory, if the court doesn't have further questions about that theory. For the contingent compensation fraud theory, you know, assuming Eric made this comment that Mr. McLeod's contingent compensation or net profits would not be reduced if there was a shared story by credit, there's no tribal issue on damages because Mr. McLeod didn't receive any contingent compensation. So without any contingent compensation, it doesn't matter whether his share was reduced. There's no damages there. So just briefly on the oral agreement issue, you know, as we discussed in our brief and in our motion to strike that the theory in the summary judgment papers, the opposition really was that, you know, focused on the fact that Mark and Eric were parties to the written agreement, and we explained why they weren't parties to the written agreement, and then kind of went on to say that they, quote, continued to be the manager. So I don't know what the word continued means other than a continuation of the written agreement. And, again, our position is that that was just between Mr. McLeod and zero gravity. And in terms of Mark's role, you know, again, I think there's no dispute he acted as a producer, and producers don't owe fiduciary duties. And just some kind of quick facts about, you know, the role of manager versus producer. So Eric is a talent manager, and he was the one who reached out to Mr. McLeod in 2011, recruited him, not Mark. Eric was the one who shared the ideas for movies, not Mark. He said, let's find something for you to develop. But isn't there a tribal issue of whether during the relevant time Mark said, I'm your manager? Yes, I think the question is whether if Mark made that statement, if that's sufficient. Because as the district court explained, there's no evidence that he actually acted as a manager, given that Eric was the one who kind of had all the conversations about developing the film. And then, you know, when Mark worked for about a decade on the film, everything he did was tied to recruiting actors and getting sculptor media to get involved to co-produce and bring in financing and involvement with directors. That's all the role of a producer. So I guess the question is whether that one statement, I am your manager, is sufficient to raise a tribal issue. And our position would be that a reasonable jury would not conclude that, you know, that sentence alone would be sufficient. But again, as I noted, I think that the court can just focus on damages, because that is dispositive of all of the issues in the case. And in terms of, you know, I'm not going to sign if you don't give me more, I've kind of pointed out all of the evidence in the record why that's just speculative, that he could receive more. So if there are no further questions from the court. Nope. Thank you. Firstly, the citation I promised your honors is 8 E.R. 1745. Mr. McLeod did receive residuals. I'm sorry, you said 8 E.R. 17? Sorry, 8 E.R. 1745. Okay. Thank you. Give us a second, because I think we're all probably going to want to track that down. We've all got it here electronically. Almost all. Some of us have electronically. So he can actually find it faster with paper than we can with the iPads. So just give us a second here. You said 1745. That's one downside of the iPad is that it actually is, to find a particular page, it's actually slower. But we're getting there. I think Judge Thomas is already there. It's like I said, it's where Eric says Mark's going to get involved in discussion about your purchase price. When he says Mark is going to call her boss too? Yes. But I have also some testimony from McLeod as well to the question of services of a manager. And at the beginning of McLeod's deposition, he gave what would be the Marathon v. Blasi definition of what a manager does. He said this is what these guys were doing for me all along. And at one point in McLeod's deposition at ER 1491, line 11, question. Okay, so when you were emailing back and forth with Mark, was he giving the type of advice necessary to develop you as a writer in your career? Or was he sharing information with you that was more customary for a producer on a film? Answer. I think I would say both. And just there is a legion of evidence, of record evidence, of whether Mark actually performed services as a manager on behalf of McLeod. There's all from McLeod's deposition, 6 ER 1279-1280, 6 ER 1293. Some of this is like that one would be where he's speaking of the representation agreement producer provision. And he's saying that's subject to their obligation to me as my manager. And I will say it is our contention from day one that under that written agreement, the managers, it's a personal relationship that those individual managers were bound by that written representation agreement. And whereas we do not contend that all of the terms carried over, some of them did, particularly those that would be supported by custom and usage. And one of those written terms is that the producer's fees will be negotiated in good faith. And the defense argued, well, doesn't that just mean they need to negotiate their producer fees with third parties? Like, why would that be in the contract? And if you're identifying this potential conflict of interest and you're telling me you're going to take producer's fees, doesn't that provision mean you're going to talk to me about what the producer's fees were? And you know they didn't. They didn't do that. And that was a breach of that agreement. And we say that term did carry over. And the fact of that matter is that goes directly to the damages. Because had they said, hey, well, we're getting a million bucks on it and the budget's $43 million, McCloud certainly would have said, well, hey, that's not fair. And after the fact, when McCloud found out, and this is in the expert report. It's also in McCloud's deposition. After the fact, when he found out the budget, he went to Mark and Eric. He wrote him, what the hell? The budget's $40 million? And they said, well, maybe more like $30. And then he said, well, what did you guys get? No response. That was the last communication between these folks. Now, on that issue of the $20 million thing, there's an email in there where, yes, Eric Williams writes to Sugarman saying, hey, you know, the budget's almost approximately $20 million now. When they produced the document, when they were talking about the document at first, they didn't include the reply. The reply from Sugarman was, oh, hey, that's great. Have you told Curt? Because he told Eric, have you told Curt? And, of course, Eric didn't. And when Eric, when I deposed Eric at his deposition, his response was, well, you know, that wasn't really a real number. It wasn't really a real number, so I didn't tell him. And that's also identified in the record. It's in Curt McCloud's testimony. And it's also in the expert report of Ginsburg. And, again, another impact of damages is the residuals. You should probably wrap it up because you're well over time now. Thank you, Your Honor. Just the last thing. Last thing. There were residuals. He got over $100,000 in residuals. The story by credit, the sharing of that affected his residuals. Gassmer agreed. And Gassmer said when the whole story by credit said, he said, I don't understand why he didn't object. Well, why didn't he object? Because his managers were telling him he had to do it. Thank you. Thank you very much, counsel. Thank you to both of you for your briefing and argument. And this interesting case, Hollywood, is always interesting. I'll just leave it at that. Thank you, Your Honor. With that, this case is submitted and we are done for the day. And, again, I apologize for the delay. All rise.
judges: OWENS, BENNETT, THOMAS